1  Micha Danzig (SBN 177923)
   mdanzig@mintz.com
2  Nicole M. Rivers (SBN 309450)
   nmrivers@mintz.com
3  Mike C. Flesuras (SBN 321666)
   mcflesuras@mintz.com
4  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   3580 Carmel Mountain Road, Suite 300
5  San Diego, CA 92130
   Telephone:  858-314-1500
6  Facsimile:  858-314-1501

7  Attorneys for Plaintiff
   MIYOKO'S, PBC

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11            _____ DIVISION

12 | MIYOKO'S, PBC, a Delaware Corporation,      | Case No.:
13 |              Plaintiff,                     | **COMPLAINT FOR**
14 |     v.                                      | (1)  Breach of Contract
15 | MIYOKO SCHINNER, an individual.             | (2)  Violation of the Defend Trade
   |                                             |      Secrets Act (18 U.S.C. § 1836 *et*
16 |              Defendant.                     |      *seq.*)
17 |                                             | (3)  Violation of the Uniform Trade
   |                                             |      Secrets Act (Cal. Civ. Proc. § 3426
18 |                                             |      *et seq.*)
   |                                             | (4)  Breach of Duty of Loyalty
19 |                                             | (5)  Breach of Promissory Note
20 |                                             | **DEMAND FOR JURY TRIAL**

21

22

23

24

25

26

27

28

Plaintiff Miyoko's, PBC (the "Company") brings this Complaint against its former CEO Defendant Miyoko Schinner ("Schinner") and alleges as follows:

## INTRODUCTION

1.     This is an action by the Company to recover its trade secrets and confidential information from its founder and former CEO Miyoko Schinner, and to seek redress for Schinner's theft of this information.

2.     During her tenure as the Company's CEO, Schinner proved time and again that she could not manage a rapidly expanding business and could not correct performance deficiencies. Schinner's business management and leadership skills were deficient and did not improve over time.  She could not even maintain a consistent team of executives and repeatedly missed performance and financial targets.

3.     For years, the Company's Board worked with Schinner to improve the numerous performance deficiencies she exhibited as CEO.  After she did not address the deficiencies, the Board **unanimously** terminated her as CEO to move her to a more appropriate employee role within the Company.   Instead of cooperating in this transition, Schinner retaliated by stealing the Company's property, including its trade secrets and confidential information.

4.     When the Company discovered Schinner's theft and asked her to preserve evidence for potential litigation and return her Company-issued laptops, Schinner responded by copying the stolen property to her personal cloud storage and tried to cover her tracks by deleting the cloud-sync folder and documents from Company laptops.  To this day, Schinner has not accounted for the whereabouts of all the Company property and information she stole.

5.     The Company is a leading innovator in a growing market of plant-based cheese and butter products.  Schinner founded the Company in 2014 and was its CEO until mid-2022.

6.     The Company has grown from a small business with a handful of employees to a household name with products in thousands of stores across the country.  The Company's rapid growth required a CEO capable of taking on the increased responsibilities that come with an expanding business and the management of a larger company.

7.     Schinner could not handle these responsibilities.  She continually demonstrated that she lacked the necessary business and operational management skills to effectively run a rapidly-expanding company and recruit and maintain a high-caliber executive team.   And, when performance issues were brought to Schinner's attention, she did not take the necessary steps to address them.

8.     The Company's Board wanted to keep Schinner as CEO because she founded the Company.  It initially tried to address Schinner's poor performance through constructive feedback and coaching.  From 2018 forward, the Board coached Schinner on what it expected of her as CEO and how she could meet and exceed the Board's expectations.

9.     The Board hoped that by coaching Schinner on how to overcome her performance deficiencies, she could manage the Company's expansion and remain CEO.   Unfortunately, Schinner failed to meet the Board's performance targets and Company financial targets for both 2020 and 2021.

10.     After learning that she did not meet 2021 performance targets, Schinner declined to take responsibility and propose a plan to meet performance objectives in the future.  Instead, she shirked responsibility, blamed the then-President of the Company, and fired him.

11.     Such behavior was not unusual for Schinner.  Under her leadership, Schinner fired seven executives.  Instead of developing and maintaining a strong executive team as the Board requested, she made it difficult for her direct reports to succeed.  Schinner would initially rave about new executives and promote them, but would later turn on a dime, villainize them, and fire them.

12.     Despite Schinner's failure to improve, the Board continued to work with her and explored alternative roles for her within the Company.  The Board suggested that Schinner work as Executive Chair and hire a CEO or President to manage day-to-day operations.  Schinner initially agreed to the proposal, but later changed her mind, and requested that she remain CEO.

13.     The Board agreed to give Schinner another chance.  But it put in place quarterly objectives and key results ("OKRs") Schinner must meet to continue as CEO.

14.     Schinner failed to meet the OKRs the very next quarter (first quarter of 2022).  The quarter after that, Schinner's senior leadership team brought multiple concerns about Schinner to the Board and threatened to quit due to Schinner's mismanagement.

15.     In June 2022, based on Schinner's continued performance problems, the Company's Board **unanimously** decided to remove her as CEO and started discussions with Schinner about a new role for her within the Company. Schinner was a non-officer employee after her termination as CEO.

16.     Instead of facilitating an orderly transition, following her termination as CEO, Schinner hatched a plot to steal the Company's property, trade secrets, and confidential information so that she could create a competing company.

17.     On July 12, 2022, the Company informed its workforce that Schinner was stepping down as CEO.  From that point forward, Schinner intentionally disrupted Company operations and signaled her intent to start her own company to compete with the Company.  For example, on July 15, 2022, she wrote the following to the Company's President: "I will start my own retail shop or another company."

18.     Schinner then raided the Company's internal cloud storage and downloaded vast amounts of data, including R&D materials containing the Company's most valuable intellectual property: its proprietary recipes and plant-based culture configurations.  This highly proprietary information was not stored in a location accessible to Board members, but Schinner retained access to this information by virtue of her continued employment with the Company after the Board removed her as CEO.  She also enlisted the help of now-former Company employees to carry out her scheme.

19.     At Schinner's direction, over 24,000 documents were initially taken from the Company's internal storage and downloaded to a non-company hard drive (a Seagate OneTouch) from an external IP address.

20.     Schinner also stole the Company's physical property.  After Schinner's employment ended, she enlisted a former employee, Jennifer Kirkham, to rifle through the Company's R&D

facility and warehouse.   Video surveillance captured the two removing property from the warehouse, removing cheese cultures and unreleased product prototypes from the Company's industrial refrigerator—all illegally and without the Company's authorization.







21.     Schinner later directed Kirkham to take additional confidential documents from the Company that were not in Schinner's first download.  Kirkham downloaded this batch of the Company's IP to a thumb-drive and had it delivered to Schinner.

22.     On September 8, 2022, the Company discovered Schinner's plot.  The Company issued two separate notices to Schinner's counsel advising her of her legal obligations to preserve everything relating to its investigation of Schinner's theft, and to refrain from opening her Company-issued laptops.

23.     Schinner did neither.  In violation of the two preservation notices, Schinner logged into the laptops to back up the stolen property and cover her tracks.  She created a folder called "Miyoko's Creamery Files," synced it to her personal Dropbox, and uploaded the Company's stolen IP on those laptops to her personal cloud.  She then tried to cover up what she had done, searching the internet for "how to remove dropbox from my computer," "how to uninstall Dropbox from my computer," and "will deleting dropbox folders from my computer remove it from the cloud."  Schinner then wiped around 2,900 documents from the two Company computers.  Forensics later revealed that Schinner backed up nearly the entire contents of the Company's documents from her Company–issued laptops to her personal Dropbox and Google Drive.

24.     After discovering the extent of Schinner's theft and her efforts to cover her tracks, the Company exhausted all reasonable efforts to get Schinner to return all copies of the Company's confidential and proprietary information and to provide credible assurances of the same.  Schinner refused, and the Company was forced to bring this action to protect its trade secrets and confidential information.

## THE PARTIES

25.     The Company is a Delaware public benefit corporation having its principal place of business at 2086 Marina Avenue, Petaluma, California 94954.

26.     On information and belief, Schinner resides at 2600 Nicasio Valley Road, Nicasio, CA 94946.  Schinner was employed as the Company's CEO, working at its Petaluma facility, until

the Company removed her as CEO but retained her as an employee for a period of time, including when the facts giving rise to this Complaint began to take place.

## JURISDICTION

27.   This Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1357 because those claims are part of the same case or controversy.

## VENUE

28.   Venue is proper under 28 U.S.C. §§ 1391(b) and (c) because Schinner resides in Nicasio, California, which is within the Northern District of California, and conducts business in this District.  Schinner committed the wrongful acts within this District.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims pled herein occurred in the Northern District of California and a substantial part of the property that is the subject of the claims is situated in the Northern District of California.  Specifically, the misappropriated trade secret and confidential information was accessed, viewed, downloaded, and retained by Schinner in the Northern District of California.  The Company's is informed and believes that its misappropriated trade secret and confidential information resides in the Northern District of California on, at minimum, cloud-based storage applications within Schinner's possession.

## DIVISIONAL ASSIGNMENT

29.   This is an action for trade secret misappropriation where a substantial part of the events or omissions that give rise to the claims have taken place in and where a substantial part of the property that is subject to the action is situated in Sonoma County.  Thus, under Civil L.R. 3-2(c) and (d), this action should be assigned to the San Francisco or Oakland Division.

## FACTUAL ALLEGATIONS

***The Company Creates Proprietary Plaint-Based Cheeses, Butters, and Spreads and Diligently Protects its IP***

30.   The Company is a leading innovator at the forefront of a growing market of plant-based cheese and butter products.  Its plant-based milks and cheeses are created with one-of-a-kind,

proprietary recipes and cultures.  As a company devoted to bringing the world innovative plant-based alternatives to staple dairy products, the Company devotes significant time and resources to research and development—undertaken in a location walled off from non-R&D departments—to formulate, market, and sell new and innovative products across the country.

31.    Because its very existence as a company is based on these proprietary recipes and cultures, the Company takes diligent steps to protect its trade secrets and confidential information. These steps include requiring all Company employees to sign confidentiality agreements and proprietary rights agreements as a condition of employment.  The Company's R&D department is also walled off from other departments and employees.  Access to R&D materials is limited.  Its employee handbook—which employees must acknowledge—reaffirms the importance of keeping the Company's trade secrets confidential.

*Schinner's Confidentiality Obligations*

32.    As a condition of her employment, Schinner signed a Confidential Information and Invention Assignment Agreement with the Company dated July 22, 2021 ("CIIAA").  A true and correct copy of the signed CIIA is attached hereto as **Exhibit A**.  The CIIA provides in part that:

> I agree at all times during the term of my Relationship with the Company and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm, corporation or other entity without written authorization of the Board of Directors of the Company, any Confidential Information of the Company which I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

The CIIA defines "Confidential Information" to include:

> information pertaining to any aspects of the Company's business which is either information not known by actual or potential competitors of the Company or is proprietary information of the Company or its customers or suppliers, whether of a technical nature or otherwise.  I further understand that Confidential Information does not include any of the foregoing items which has become publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

*The Company Rapidly Grows, but Schinner Cannot Manage a Growing Business*

33.    The Company has grown from a small business with a handful of employees to a

household name with products in thousands of stores across the country.  The Company's rapid growth required a CEO capable of taking on the increased responsibilities that come with an expanding business and larger company.

34.    Schinner could not handle these responsibilities.  She continually demonstrated that she lacked the necessary business and operational management skills to effectively run a rapidly-expanding company.  And, when performance issues were brought to Schinner's attention, she did not take the necessary steps to address them.

### The Board Coaches Schinner on its Expectations for her Role as CEO

35.    The Company's Board wanted to keep Schinner as CEO because she founded the Company.  It initially tried to address Schinner's poor performance through constructive feedback and coaching.  From 2018 forward, the Board coached Schinner on what it expected of her as CEO and how she could meet and exceed the Board's expectations.

36.    Specifically, the Board coached Schinner in the following areas, among others: (1) the fundamentals of CEO leadership, including the importance of having a general understanding of each function of the business; (2) managing expectations for employees, investors, the Board, and retail partners with an eye towards over-delivering on promises; (3) taking ownership of mistakes while offering proactive plans to avoid repeating them; (4) building trusted relationships with executives, investors, and her entire team; (5) managing the complex operational issues inherent in managing a company with multiple suppliers and multiple retail partners; (6) new business generation; and (7) financial planning and budgeting.

### Schinner's Performance Problems Continue Despite the Board's Coaching

37.    In 2019, the Company set specific goals that Schinner was responsible for achieving.  These goals pertained to revenue, new product introductions, manufacturing improvements, hiring new executives, and a five-year innovation roadmap.  Schinner failed to achieve any of them.

38.    2021 was no different.  In the fall of 2021, the Company, under Schinner's leadership, failed to meet performance objectives once again.  Schinner shirked responsibility for the failure, blamed the Company's then-president, and fired him.

39.     Such behavior was not unusual for Schinner.  Under her leadership, Schinner fired seven executives.  Instead of developing and maintaining a strong executive team as the Board requested, she made it difficult for her direct reports to succeed.  Schinner would initially rave about new executives and promote them, but would later turn on a dime, villainize them, and fire them.

40.     Schinner also would make major business decisions, such as discontinuing entire product lines without first consulting the Board.  For example, in 2020 Schinner championed the release of new cheese products that came in both slices and shreds.  But then she unilaterally discontinued these products in early September 2021, revealing her decision to the Board only after she told key retail customers about the discontinuation of a major product line.

***The Company Gives Schinner Another Chance, She Again Fails to Meet Expectations***

41.     Despite Schinner's failure to improve, the Board continued to work with her and explored alternative roles for her within the Company.  The Board suggested that Schinner work as Executive Chair and hire a CEO or President to manage day-to-day operations.  Schinner initially agreed to the proposal, but later changed her mind, and requested that she remain CEO.

42.     The Board agreed to give Schinner another chance.  But it put in place quarterly objectives and key results ("OKRs") Schinner must meet to continue as CEO.

43.     Schinner failed to meet the OKRs the very next quarter (first of 2022).  And the quarter after that, Schinner's team brought multiple concerns about Schinner to the Board and threatened to quit due to Schinner's management.

***The Company Removes Schinner as CEO***

44.     In June 2022, the Board unanimously voted to remove Schinner as CEO, after which she was a non-officer employee of the Company.  On July 12, 2022, the Company informed its entire workforce that Schinner was stepping down as CEO.

45.     Three days later, on July 15, Schinner emailed the Company's President expressing her intent to start a competing company, writing:  "I will start my own retail shop or another company."

46.     As Schinner continued to disrupt operations, the Company noticed a board meeting for July 28 (which Schinner received a few days before the meeting) to discuss whether Schinner's employment would be terminated entirely to avoid future disruptive activity.

### *Schinner Misappropriates the Company's Confidential Information and Trade Secrets*

47.     After receiving notice of the board meeting, on July 26 and 27, 2022, Schinner— while still a Company employee—accessed the Company's internal cloud storage (called "Box") and downloaded numerous Company-created folders, including both Executive and R&D materials.  During the July 28 board meeting, the Board decided to terminate Schinner's employment.

48.     Forensics on Schinner's company laptops (a Dell XPS and Lenovo ThinkPad) revealed that on July 28, the day the Board terminated her employment, someone connected a non-Company hard drive (a Seagate OneTouch, the existence of which Schinner has failed to disclose and return) to Schinner's Company-provided Dell XPS laptop.  That person copied "outlook.pst" and "backup.pst" files from Schinner's company laptop to the Seagate hard drive, thereby allowing Schinner to retain her company emails and other files that contained a wide variety of trade secrets and confidential Company information.[1]

49.     Three days later, on information and belief, Schinner enlisted a now former Company employee, Chris Anaya ("Anaya"), to assist her in further misappropriating confidential company information.  On July 31, 2022, 24,641 Company documents were downloaded using Schinner's credentials and from an IP address outside the Company previously used by Anaya.

50.     Later that day, Schinner or someone at her direction, created a folder named "Box" on Schinner's Dell XPS company laptop.  Schinner or someone at her direction, then copied numerous folders from the Company's Box cloud system to this folder.  The copied folders

---

[1] While Schinner has not accounted for the property she stole and has the Company's confidential information in her possession, she did return certain company hardware, which allowed the Company to conduct a forensic examination of the hardware and learn the specifics of what Schinner did to steal confidential information after her termination as CEO and her efforts to conceal her theft after receiving a litigation hold notice from the Company.

COMPLAINT

included folders with the following names: "AA Archive, "CORPORATE," EXECUTIVE," FINANCE," "Headshots," "HR," "INNOVATIL," "INNOVATION PHOTOS," and "OPERATIONS."

| Ref # | Artifact | Linked Path | Created UTC | Last Modified UTC | Accessed UTC | Target File Created UTC |
|---|---|---|---|---|---|---|
| 1 | LNK Files | D:\Box\OPERATIONS | | | | 07/31/2022  22:25:09 |
| 2 | Jump Lists | D:\Box\OPERATIONS | | | 08/02/2022  20:26:32 | 07/31/2022  22:25:09 |
| 3 | LNK Files | D:\Box\INNOVATIL | | | | 07/31/2022  21:51:20 |
| 4 | Jump Lists | D:\Box\INNOVATION PHOTOS | | | 08/02/2022  20:26:29 | 07/31/2022  21:51:20 |
| 5 | Jump Lists | D:\Box\HR | | | 08/02/2022  20:26:35 | 07/31/2022  20:34:58 |
| 6 | LNK Files | D:\Box\Headshots | | | 07/31/2022  20:23:07 | 07/31/2022  20:23:07 |
| 7 | Jump Lists | D:\Box\Headshots | | | 07/31/2022  20:26:00 | 07/31/2022  20:23:07 |
| 8 | LNK Files | D:\Box\FINANCE | | | | 07/31/2022  19:49:13 |
| 9 | Jump Lists | D:\Box\FINANCE | | | 07/31/2022  20:25:38 | 07/31/2022  19:49:13 |
| 10 | LNK Files | D:\Box\EXECUTIVE | | | | 07/31/2022  18:43:25 |
| 11 | Jump Lists | D:\Box\EXECUTIVE | | | 07/31/2022  19:46:19 | 07/31/2022  18:43:25 |
| 12 | Jump Lists | D:\Box\EXECUTIVE\Miyokos Impact Call Questions_vSENT (002).docx | | | 07/31/2022  19:45:44 | 07/31/2022  18:43:25 |
| 13 | LNK Files | D:\EXECUTIVE | | | | 07/31/2022  18:43:25 |
| 14 | LNK Files | D:\EXECUTIVE | 07/31/2022  19:45:44 | 07/31/2022  19:45:44 | 09/16/2022  14:03:04 | 07/31/2022  18:43:25 |
| 15 | LNK Files | D:\EXECUTIVE\Miyokos Impact Call Questions_vSENT (002).docx | 07/31/2022  19:45:44 | 07/31/2022  19:45:44 | 09/16/2022  14:03:04 | 07/31/2022  18:43:25 |
| 16 | Jump Lists | D:\EXECUTIVE\Miyokos Impact Call Questions_vSENT (002).docx | | | 07/31/2022  19:45:44 | 07/31/2022  18:43:25 |
| 17 | LNK Files | D:\Box\CORPORATE | | | 07/31/2022  18:38:23 | 07/31/2022  17:37:03 |
| 18 | Shellbags | D:\Box\ | 07/31/2022  17:31:40 | 07/31/2022  20:26:52 | 07/31/2022  17:31:28 | 07/31/2022  17:31:28 |
| 19 | LNK Files | D:\Box | | | 07/31/2022  17:31:27 | 07/31/2022  17:31:27 |
| 20 | LNK Files | D:\Box | 07/31/2022  1:31:32 | 07/31/2022  1:31:32 | 09/16/2022  14:03:04 | 07/31/2022  17:31:27 |
| 21 | LNK Files | D:\Box | | | | 07/31/2022  17:31:27 |
| 22 | Jump Lists | D:\Box | | | 08/02/2022  20:26:25 | 07/31/2022  17:31:27 |
| 23 | Jump Lists | D:\Box\AA  ARCHIVE | | | 07/31/2022  17:31:36 | 07/31/2022  16:32:53 |
| 24 | LNK Files | D:\backup.pst | | | | 07/28/2022  22:48:17 |
| 25 | LNK Files | D:\backup.pst | 07/28/2022  22:47:44 | 07/29/2022  00:18:33 | 09/16/2022  14:03:04 | 07/28/2022  22:48:17 |
| 26 | LNK Files | D:\backup.pst | | | | 07/28/2022  22:48:17 |
| 27 | Jump Lists | D:\backup.pst | | | 07/29/2022  00:18:33 | 07/28/2022  22:48:17 |

51.     On August 12, 2022, Anaya's employment ended.  With Anaya no longer a Company employee, on information and belief, Schinner searched for additional help to carry out her scheme to steal the Company's confidential and proprietary information.  She enlisted the help of Jennifer Kirkham ("Kirkham").  On August 15, 2022, Kirkham gave her two-week notice to the Company.

52.     Later that same week, on a Saturday, Schinner and Kirkham accessed the Company's R&D facility and warehouse and were surveilled—on video—removing Company property from the warehouse and removing cheese cultures from the Company's industrial refrigerator.  They did this without authorization from the Company.  Schinner and Kirkham were also captured on video transferring a refrigerator from Kirkham's car to Schinner's moving truck:

1
2
3
4
5
6
7
8
9
10



11   53.   Five days later, on August 25, 2022, Kirkham inserted a non-Company thumb drive

12   into her Company laptop (a MacBook).  She downloaded a host of Company documents from Box

13   to the MacBook, *which contained a file directory not yet on Box at the time Schinner downloaded*

14   *the R&D related folders on July 27*.  After downloading the Company documents to the thumb

15   drive, Kirkham delivered them to Schinner through an intermediary.  After receiving the thumb

16   drive, Schinner connected it to her Lenovo company laptop and copied its contents to her personal

17   Dropbox account.

18   54.   One of the folders Schinner took—titled "AA Archive"—contains imaging of the

19   computers of every former employee of the Company, including those in R&D.  A sample review

20   of that folder alone contains many proprietary culture configurations used to create the Company's

21   plant-based products.  These culture configurations took years and substantial resources to develop.

22   The folder also contains many proprietary Company recipes.  The other folders Schinner took from

23   the Company contained many other highly proprietary and confidential documents.

24   ***The Company Discovers Schinner's Misappropriation and Notifies Her of Her***
     ***Preservation Obligations***

25

26   55.   On September 8, 2022, the Company first became aware that Schinner had potentially

27   acted improperly as an employee by taking company documents and information and began to

28   investigate.  Counsel for the Company advised Schinner's counsel on two separate occasions of

Schinner's legal obligations to preserve all documents and information related to the matter.  On September 15, 2022, counsel for the Company sent Schinner's counsel a detailed document preservation letter, and followed up five days later with an email, stating:

> [], it bears repeating that [Schinner] should not at this point on her own even turn on these company provided laptops, let alone delete anything from them; without the parties first agreeing on the approach to ensure that the company gets all of its files and property back, while also ensuring that [Schinner] gets any personal files she may have placed on those laptops.

(Email from M. Danzig to R. Idell, September 20, 2022.)

56.     On September 16, 2022, the Company, through its counsel, demanded that Schinner return all company computers, the thumb drive, any other hardware containing company documents and information, and all other Company property.  The Company's counsel followed up with Schinner's counsel on September 20 and September 22 to retrieve the Company's property from Schinner.  On September 22, Schinner's counsel advised that he was meeting with Schinner later that day to arrange the return of Company property.  Yet, it was not until September 27 that Schinner turned over some Company property.

### Schinner Flouts her Preservation Obligations

57.     During this period of time (September 15 through September 27, 2022), despite correspondence cautioning that in keeping with her preservation obligations Schinner should not even turn on the Company computers, forensics revealed that Schinner took the following actions *after* the Company's two preservation notices:

- September 22, 2022:  Schinner logged into the Lenovo Company laptop and searched: "how to remove dropbox from my computer."

- September 24, 2022:  Schinner logged into the Lenovo again visiting a site "How to uninstall Dropbox from my computer."

- September 24, 2022:  Schinner accessed the Dell Company laptop and created a folder called "Miyoko's Creamery files" and synced that folder to her personal Dropbox.

- September 24, 2022:  Schinner accessed the Lenovo and searched "will deleting dropbox folders from my computer remove it from the cloud."

- September 24, 2022:  Schinner deletes over 400 documents from the Lenovo.

- September 24, 2022:  Schinner deletes over 2,500 documents from the Dell.

- September 27, 2022:  Schinner accesses a spreadsheet from the Dell called "CHEESE EXPERIMENTS.xlsx" located in her Google Drive.

58.     Many of the file names of the documents Schinner wiped from the laptops appear to reflect proprietary recipes of the Company:

| Ref # | Deletion Date | File Name | Extension |
|---|---|---|---|
| 328 | 09/24/2022  16:27:28 | PS_Vega_nu-trish_GY-101_722783_EN.pdf | .pdf |
| 329 | 09/24/2022  16:27:28 | PS_Vega_FreshQ_101_721641_EN.pdf | .pdf |
| 330 | 09/24/2022  16:27:28 | Vega Starter Cultures EN.pdf | .pdf |
| 331 | 09/24/2022  16:27:28 | Product Catalog_Dairy cultures_FY2020_CUSTOMER version_13FEB2020.pdf | .pdf |
| 332 | 09/24/2022  16:27:28 | PS_Vega_Premium_722988_EN.pdf | .pdf |
| 333 | 09/24/2022  16:27:28 | PI_GLOB_T-SPX_501095_EN.pdf | .pdf |
| 334 | 09/24/2022  16:27:28 | PI_GLOB_Rubis_705584_EN.pdf | .pdf |
| 335 | 09/24/2022  16:27:28 | PI_GLOB_F-RM-52U5_713365_EN.pdf | .pdf |
| 336 | 09/24/2022  16:27:28 | PI_GLOB_B-LC-20_669507_EN.pdf | .pdf |
| 337 | 09/24/2022  16:27:28 | PI_GLOB_B-2_501116_EN.pdf | .pdf |
| 338 | 09/24/2022  16:27:28 | PI_EU_Vega_nu-trish_GY-101_722783_EN.pdf | .pdf |
| 339 | 09/24/2022  16:27:28 | PI_EU_nu-trish_LGG_DA_720970_EN.pdf | .pdf |
| 340 | 09/24/2022  16:27:28 | PI_EU_FreshQ_DA1_721641_EN.pdf | .pdf |
| 341 | 09/24/2022  16:27:28 | FreshQ DA.pdf | .pdf |
| 342 | 09/24/2022  16:27:28 | FLC_Culture Type And Uses-AlliedKenco.pdf | .pdf |
| 343 | 09/24/2022  16:27:28 | SR 3 LYO 10 D_12_8_2016_PDS.pdf | .pdf |
| 344 | 09/24/2022  16:27:28 | FR 22 LYO 10 D_12_2_2016_PDS.pdf | .pdf |
| 345 | 09/24/2022  16:27:28 | LR LYO 10 D_12_15_2016_PDS.pdf | .pdf |
| 346 | 09/24/2022  16:27:08 | Miyokos Creamery CH Mutual NDA v1.docx | .docx |
| 347 | 09/24/2022  16:27:08 | lallemand_info_nelson_jameson.docx | .docx |
| 348 | 09/24/2022  16:27:08 | Sacco weight to price.docx | .docx |
| 349 | 09/24/2022  16:27:08 | culture explanation.docx | .docx |
| 350 | 09/24/2022  16:27:08 | Name list of cultures at Miyokos_031522.xlsx | .xlsx |
| 351 | 09/24/2022  15:48:44 | $RNQB60C.docx | .docx |

| Ref # | Deletion Date | File Path | File Name | Extension |
|---|---|---|---|---|
| 2397 | 09/24/2022  17:21:04 | | Page 5.docx | .docx |
| 2398 | 09/24/2022  17:21:04 | | Pastry Cream.docx | .docx |
| 2399 | 09/24/2022  17:21:04 | | Pate a Choux -2.docx | .docx |
| 2400 | 09/24/2022  17:21:04 | | Piemonte Schedule.docx | .docx |
| 2401 | 09/24/2022  17:21:04 | | Plant Milk 101.docx | .docx |
| 2402 | 09/24/2022  17:21:04 | | Potato Roulade.docx | .docx |
| 2403 | 09/24/2022  17:21:04 | | Proposal for Taste of Health Cruise.docx | .docx |
| 2404 | 09/24/2022  17:21:04 | | Qualities for Common Board Member.docx | .docx |
| 2405 | 09/24/2022  17:21:04 | | Questions for Investors Series C.docx | .docx |
| 2406 | 09/24/2022  17:21:04 | | Questions for Investors.docx | .docx |
| 2407 | 09/24/2022  17:21:04 | | Ranch Dressing.docx | .docx |
| 2408 | 09/24/2022  17:21:04 | | Raspberry Dressing.docx | .docx |
| 2409 | 09/24/2022  17:21:04 | | Roles.docx | .docx |
| 2410 | 09/24/2022  17:21:04 | | Spicy Revolution Mac and Cheese.docx | .docx |
| 2411 | 09/24/2022  17:21:04 | | Sr. Technologist Cheese 2021.docx | .docx |
| 2412 | 09/24/2022  17:21:04 | | The Creamery of Tomorrow Discussion -- FFT roundtable.docx | .docx |
| 2413 | 09/24/2022  17:21:04 | | Topics for videos.docx | .docx |
| 2414 | 09/24/2022  17:21:04 | | TPG.docx | .docx |
| 2415 | 09/24/2022  17:21:04 | | Truffle Mac and Cheese.docx | .docx |
| 2416 | 09/24/2022  17:21:04 | | UnChicken.docx | .docx |
| 2417 | 09/24/2022  17:21:04 | | Vanilla.docx | .docx |
| 2418 | 09/24/2022  17:21:04 | | Warm Carpaccio of Zucchini Salad.docx | .docx |
| 2419 | 09/24/2022  17:21:04 | | When you are looking for a vegan treat.docx | .docx |
| 2420 | 09/24/2022  17:21:04 | | Whole Wheat Pancakes.docx | .docx |
| 2421 | 09/24/2022  17:21:04 | | Wine & Cheese Fundraiser Menu.docx | .docx |
| 2422 | 09/24/2022  17:21:04 | | Wine and Cheese Fundraiser.docx | .docx |
| 2423 | 09/24/2022  17:21:04 | | Recipes - Shortcut.lnk | .lnk |

- 14 -

COMPLAINT

1

2

***Schinner Copies the Company's Trade Secrets to her Personal Dropbox and Google Drive***

59.     Forensics further confirmed that Schinner, without permission or authorization from the Company, backed up nearly the entire contents of the Company's documents from her Company-issued laptops to her personal Dropbox and Google Drive.  Her subsequent return of the two laptops to the Company effectively amounted to her only returning the depreciated value of the laptop hardware while keeping for herself a duplicate of all of the Company's most valuable, confidential and proprietary information and IP in her personal cloud accounts.  After discovering all of the foregoing forensic information about Schinner's access to, copying of and deletion of valuable, confidential and proprietary information, the Company exhausted all reasonable efforts to get Schinner to return all copies of the Company's confidential and proprietary information and to provide credible assurances of same.  Schinner refused, thereby necessitating this action.

***Schinner Fails to Repay a Promissory Note***

60.     On or about September 25, 2020, the Company and Schinner entered into a written agreement titled Full Recourse Promissory Note (the "Promissory Note").  A true and correct copy of the Promissory Note is attached hereto as **Exhibit B**.  Under the Promissory Note, Schinner agreed to pay the Company the principal amount of $112,500 plus interest accruing on the outstanding principal following on the 60th day following the termination of her employment.  To date, Schinner has made no such payment and is in default.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

61.     The Company realleges and restates all prior paragraphs as if fully restated herein.

62.     The CIIA signed by Schinner is a valid and enforceable contract.  The confidentiality covenants and other provisions contained in the CIIA are reasonably necessary to protect legitimate protectable interests in the Company's confidential, proprietary, and trade secret information.

63.     The Company has fully performed all of its obligations under the CIIA.

64.     After her removal as CEO of the Company, Schinner copied, took, and retained the Company's confidential information and trade secrets in direct violation of the provisions of the

CIIA, which required her to hold such information "in strictest confidence, "not to use," and "not to make copies" without Company authorization.

65.    Schinner breached the CIIA after her removal as CEO by, at a minimum, accessing and taking Company cheese cultures and other products from the Company's facilities and by copying, downloading, and then retaining the Company's trade secrets and confidential information in her personal cloud-based storage accounts without Company authorization to, on information and belief, unlawfully use for her own benefit.

66.    Despite the Company's counsel alerting Schinner's counsel of her preservation obligations, including not logging into her Company-issued laptops, Schinner deleted, scrubbed, or otherwise modified the contents of her Company-issued computers after being notified of her preservation obligations and before returning them.  These efforts by Schinner obscured the details relating to her use of the Company's trade secret information, and any decision to improperly retain the Company's trade secret information in violation of, at least, the CIIA.

67.    As a result of Schinner's breaches of the CIIA after her removal as CEO, the Company has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial.  The documents that Schinner has improperly retained are the product of substantial research and development work by the Company over a period of many years.  Schinner's actions have threatened the Company with losing its competitive advantage, trade secrets, customers, and goodwill in amounts that would be impossible to fully compensate the Company unless Schinner is enjoined and restrained by order of this Court.

**SECOND CAUSE OF ACTION**
**(Violation of the Defend Trade Secrets Act - 18 U.S.C. § 1836 *et seq.*)**

68.    The Company realleges and restates all prior paragraphs as if fully restated herein.

69.    The Company is the owner of trade secret and confidential information, including but not limited to, its proprietary, plant-based recipes and culture configurations used to create its unique products that constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

70.     The above-detailed trade secret and confidential information that Schinner, after her termination as CEO, accessed, used, copied, forwarded, downloaded, and retained derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by the Company's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.  These trade secrets are also the product of years of research and development at substantial cost to the Company.  These trade secrets form the foundation of the Company's competitive position in the market of plant-based dairy products.

71.     At all times relevant herein, the Company has taken reasonable measures to protect the secrecy of its trade secrets and confidential information, including those which Schinner has misappropriated.

72.     The Company's trade secret and confidential information relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the country and throughout the world.

73.     Following her termination as CEO, Schinner misappropriated the Company's trade secrets and confidential information during an employer-employee relationship knowing that when she accessed, copied, forwarded, took, and retained them she did so after her removal as CEO and in violation of, at minimum, her contractual obligations to maintain secrecy under the CIIA.

74.     Schinner's improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA").

75.     As a direct and proximate result of Schinner's conduct, the Company has been injured, and is threatened with further injury, in an amount that will be proven at trial.  The Company has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Schinner's misappropriation.  As a further proximate result of her misappropriation and use of the Company's trade secrets, Schinner has been unjustly enriched.

76.    Schinner's conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after being removed as CEO, she took and retained Company proprietary products and cheese cultures, as well as thousands of documents, including imaging of every former employee's computer in R&D.  And after the Company's counsel notified Schinner of her preservation duties, she accessed her Company-issued computers, copied the Company's trade secrets to her personal cloud-based platforms and deleted thousands of documents from the computers before eventually returning the computers to the Company.

77.    Schinner's conduct constitutes transgressions of a continuing nature for which the Company has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Schinner may continue to retain and use the Company's trade secret information to enrich herself and divert business from the Company to her.  The Company is entitled to an injunction against Schinner's actual and threatened potential violation of the DTSA.

### THIRD CAUSE OF ACTION
### (Violation of the Uniform Trade Secrets Act - Cal. Civ. Proc. § 3426 et seq.)

78.    The Company realleges and restates all prior paragraphs as if fully restated herein.

79.    The Company is the owner of trade secret and confidential information, including but not limited to its proprietary, plant-based recipes and culture configurations used to create its unique products that constitute "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

80.    The above-detailed trade secret and confidential information that Schinner accessed, used, copied, forwarded, and downloaded derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by the Company's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.  These trade secrets are also the product of years of research and development at substantial cost to the Company.  These trade secrets form the foundation of the Company's competitive position in the market of plant-based dairy products.

81.   At all times relevant herein, the Company has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including that which Schinner has misappropriated.

82.   Schinner misappropriated the Company's trade secrets and confidential information during an employer-employee relationship, knowing that when she accessed, copied, forwarded, took, and retained them she did so after she was removed as CEO and in violation of at minimum her contractual obligations to maintain secrecy under the CIIA.

83.   Schinner's improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Uniform Trade Secrets Act ("UTSA").

84.   As a direct and proximate result of Schinner's conduct, the Company has been injured, and is threatened with further injury, in an amount that will be proven at trial.  The Company has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Schinner's misappropriation.  As a further proximate result of the misappropriation and use of the Company's trade secrets, Schinner has been unjustly enriched.

85.   Schinner's conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after being removed as CEO, she took and retained Company proprietary products and cheese cultures as well as thousands of documents, including imaging of every former employee's computer in R&D sequestered in the "AA Archive" folder.  And after the Company's counsel notified Schinner of her preservation duties, she accessed her Company-issued computers, copied the Company's trade secrets to her personal cloud-based platforms and deleted thousands of documents from the computers before eventually returning the computers themselves.

86.   Schinner's conduct constitutes transgressions of a continuing nature for which the Company has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Schinner may continue to retain and use the Company's trade secret information to enrich

herself and divert business from the Company to her.  The Company is entitled to an injunction against Schinner's actual and threatened potential violation of the UTSA.

**FOURTH CAUSE OF ACTION**
**(Breach of Duty of Loyalty)**

87.    The Company realleges and restates all prior paragraphs as if fully restated herein.

88.    Following her removal as CEO, Schinner was a non-officer employee of the Company until her termination on August 12, 2022.  As an employee of the Company, Schinner owed a duty of loyalty to the Company.  This duty required Schinner, among other obligations, not to acquire and use the Company's trade secret and confidential information for her own purposes.

89.    Schinner, after her removal as CEO while she remained an employee of the Company, knowingly acted against the Company's interests in connection with her misappropriation of the Company's trade secrets and confidential information and in violation of her contractual obligations under the CIIA described herein.

90.    The Company did not authorize Schinner's unlawful actions taken against the interests of Company.

91.    As a direct and proximate result of Schinner's conduct, the Company has been injured, and is threatened with further injury, in an amount that will be proven at trial.  The Company has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Schinner's breach of her duty of loyalty and acts of misappropriation.  As a further proximate result of Schinner's breach of her duty of loyalty and acts of misappropriation, Schinner has been unjustly enriched.

92.    Schinner's conduct has been willful and malicious, justifying an award of exemplary damages.  As described in detail above, after being removed as CEO, Schinner took Company products and cheese cultures and retained thousands of documents, including imaging of every former employee's computer in R&D sequestered in the "AA Archive" folder.  And after the Company's counsel notified Schinner of her preservation duties, she accessed her Company-issued

computers, copied the Company's trade secrets to her personal cloud-based platforms and deleted thousands of documents from the Company's computers before eventually returning them.

## FIFTH CAUSE OF ACTION
### (Breach of Promissory Note)

93.     The Company realleges and restates all prior paragraphs as if fully restated herein.

94.     On or about September 25, 2020, Schinner executed the Promissory Note.

95.     Under the Promissory Note, Schinner agreed to pay the Company the principal amount of $112,500 plus interest accruing on the outstanding principal following on the 60th day after the termination of her employment.

96.     The Company terminated Schinner's employment effective August 12, 2022.

97.     Schinner has defaulted on the payment, and there is now due and owing $112,500 in principal, plus interest accruing from October 11, 2022.

## PRAYER FOR RELIEF

WHEREFORE, the Company prays for judgment in its favor and against Schinner as follows:

1.     Awarding damages as described in each of the above claims, in favor of the Company and against Schinner in amounts to be determined at trial;

2.     Granting injunctions against Schinner, requiring her to return all stolen information and documents (and all material derivative from such information) to the Company and enjoining Schinner from further misappropriating or using the Company's trade secrets and confidential information, and other such injunctive relief as is proper;

3.     Awarding punitive and exemplary damages in favor of the Company and against Schinner in an amount to be determined at trial;

4.     Awarding the Company pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

5.     Granting the Company such other further relief as this Court deems just and proper.

1

**JURY DEMAND**

2

The Company demands a jury trial for all issues triable.

3

4  Dated:  February 16, 2023                Respectfully submitted,

5                                           MINTZ LEVIN COHN FERRIS GLOVSKY
                                            AND POPEO P.C.
6

7                                           _____/s/ Micha Danzig_____
                                            By:   Micha Danzig
8                                                 Nicole M. Rivers
                                                  Mike C. Flesuras
9
                                                  Attorneys for Plaintiff
10                                                MIYOKO'S, PBC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**EXHIBIT A**

M S

## CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed (or my employment being continued) by MIYOKO'S, PBC, a Delaware corporation or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.    **Employment Relationship**.  I understand and acknowledge that this Agreement does not alter, amend or expand upon any rights I may have to continue in the employ of, or the duration of my employment with, the Company under any existing agreements between the Company and me or under applicable law.  Any employment between the Company and me, whether commenced prior to or upon the date of this Agreement, shall be referred to herein as the "Relationship."

2.    **At-Will Relationship**.  I understand and acknowledge that my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability.

3.    **Confidential Information**.

(a)    **Company Information**.  I agree at all times during the term of my Relationship with the Company and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm, corporation or other entity without written authorization of the Board of Directors of the Company, any Confidential Information of the Company which I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Company.  I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), prices and costs, markets, software, developments, inventions, laboratory notebooks, processes, formulas, recipes, technology, designs, drawings, engineering, marketing, licenses, finances, budgets or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by me during the period of the Relationship, whether or not during working hours.  I understand that "Confidential Information" includes, but is not limited to, information pertaining to any aspects of the Company's business which is either information not known by actual or potential competitors of the Company or is proprietary information of the Company or its customers or suppliers, whether of a technical nature or otherwise.  I further understand that Confidential Information does not include any of the foregoing items which has become publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)    **Former Employer Information**.  I represent that my performance of all terms of this Agreement as an employee of the Company has not breached and will not breach any

agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or trust prior or subsequent to the commencement of my Relationship with the Company, and I will not disclose to the Company, or induce the Company to use, any inventions, confidential or proprietary information or material belonging to any previous employer or any other party.

(c)    **Third Party Information**.  I recognize that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

4.    **Inventions**.

(a)    **Inventions Retained and Licensed**.  I have attached hereto, as Exhibit A, a list describing with particularity all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to the commencement of the Relationship (collectively referred to as "Prior Inventions"), which belong solely to me or belong to me jointly with another, which relate in any way to any of the Company's proposed businesses, products or research and development, and which are not assigned to the Company hereunder.  If, in the course of my Relationship with the Company, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention as part of or in connection with such product, process or machine.

(b)    **Assignment of Inventions**.  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time in which I am employed by the Company (collectively referred to as "Inventions"), except as provided in Section 4(e) below.  I further acknowledge that all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary, unless regulated otherwise by the mandatory law of the state of California.

(c)    **Maintenance of Records**.  I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my Relationship with the Company.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, and any other format.

The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.

(d) **Patent and Copyright Rights**. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company shall deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement until the expiration of the last such intellectual property right to expire in any country of the world. If the Company is unable because of my mental or physical incapacity or unavailability or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or copyright registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company any and all claims, of any nature whatsoever, which I now or hereafter have for infringement of any and all proprietary rights assigned to the Company.

(e) **Exception to Assignments**. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet such provisions and are not otherwise disclosed on Exhibit A.

5. **Returning Company Documents**. I agree that, at the time of termination of my Relationship with the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns. I further agree that to any property situated on the Company's premises, or any other premises, and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

6.     **Notification to Other Parties**.   In the event that I leave the employ of the Company, I hereby consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7.     **Solicitation of Employees, Consultants and Other Parties**.  I agree that during the term of my Relationship with the Company, and for a period of twenty-four (24) months immediately following the termination of my Relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees, consultants, suppliers, manufacturers, or customers to terminate their relationship with the Company, or take away such employees, consultants, suppliers, manufacturers, or customers or attempt to solicit, induce, recruit, encourage or take away employees, consultants, suppliers, manufacturers, or customers of the Company, either for myself or for any other person or entity.  Further, for a period of twenty-four (24) months following termination of my Relationship with the Company for any reason, with or without cause, I shall not solicit any licensor to or customer of the Company or licensee of the Company's products, in each case, that are known to me, with respect to any business, products or services that are competitive to the products or services offered by the Company or under development as of the date of termination of my Relationship with the Company.

I understand and agree that in the course of my Relationship with the Company, I will be exposed to trade secrets and other confidential information about the Company's customers, customers' needs, pricing, discounts, sales volumes, customer preferences and other information which is useful in securing and retaining customer business.  I understand and agree that I am not to use any such information to solicit any customer or prospective customer to do business with any person or entity other than the Company, during employment or at any time thereafter.

8.     **Representations and Covenants**.

(a)     **Facilitation of Agreement**.  I agree to execute promptly any proper oath or verify any proper document required to carry out the terms of this Agreement upon the Company's written request to do so.

(b)     **Conflicts**.   I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to commencement of my Relationship with the Company.  I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict with any of the provisions of this Agreement.

(c)     **Voluntary Execution**.  I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

9.     **General Provisions**.

(a)     **Governing Law**.   The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws.

(b)      **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)      **Severability**.  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)      **Successors and Assigns**.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

(e)      **Survival**.  The provisions of this Agreement shall survive the termination of the Relationship and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(f)      **ADVICE OF COUNSEL**.  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

[Signature Page Follows]

The parties have executed this Agreement on the respective dates set forth below:

**COMPANY:**

MIYOKO'S, PBC

_____
Signature

By: Louis Kanganis

Title: President

Date: July 22, 2021

Address:

2086 Marina Ave.

Petaluma, CA 94954

**EMPLOYEE:**

_____
Signature

Printed Name: Miyoko Schinner

Date: July 22, 2021

Address:

2086 Marina Ave.

Petaluma, CA 94954

**[SIGNATURE PAGE TO CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT]**

EXHIBIT A

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP
EXCLUDED FROM SECTION 4**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

☒ No inventions or improvements

☐  Additional Sheets Attached

Signature of Employee:_____

Print Name of Employee:_____

Date:_____

Exhibit A-1

<u>EXHIBIT B</u>

Section 2870 of the California Labor Code is as follows:

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Exhibit B-1

# EXHIBIT B

DocuSign Envelope ID: A5C4EFBC-12A5-445C-ABB2-6AB8DAC80CBC

2.10.1.3.3.1.1 Full Recourse Note (Final).docx.pdf - Page 1

<u>Date</u>: September 25, 2020                                    <u>Principal Amount</u>: $112,500

## FULL RECOURSE PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, Miyoko Schinner ("**Borrower**") hereby promises to pay to the order of Miyoko's, PBC, a Delaware corporation ("**Company**") at the Company's principal businesses address or such other address as the Company may designate by notice to Borrower, the principal amount set forth above (the "Principal") plus interest accruing on the outstanding Principal commencing on the date of this Note at the rate and in the manner set forth below.

1.       <u>Definitions</u>.

(a)       "**Applicable Federal Rate**" means the mid-term applicable Federal or other rate (as defined in the Code) for a semi-annual compounding period in effect as of the date of this Note.

(b)       "**Approved Sale**" has the meaning assigned to it in the Security Agreement.

(c)       "**Code**" means the Internal Revenue Code of 1986, as amended.

(d)       "**Due Date**" means the earliest to occur of any of the following:

(i)       The fifth (5th) anniversary of the Effective Date;

(ii)       The sale, conveyance, alienation or other transfer by Borrower of any of the Collateral Shares or other Pledged Collateral other than in an Approved Sale;

(iii)       Upon the sixtieth (60th) day following a Termination of Employment for any reason;

(iv)       upon the day prior to the date that any change in Company's or Borrower's status would cause the loan evidenced by this Note to be deemed a prohibited extension or maintenance of credit by Company (or any successor entity) under Section 402 of the Sarbanes-Oxley Act of 2002 or any other applicable law, which such date shall be determined by Company in its discretion; or

(v)       upon the day prior to the earlier of (A) the date Company files a registration statement with the SEC for an initial public offering of its equity securities under the Securities Act of 1933, as amended, (B) the date the Company files a registration statement with the SEC to register any class of its securities under the Securities

Exchange Act of 1934, as amended; or (C) a Company Sale (as defined in Company's Equity Incentive Plan; or

(vi)  upon acceleration of the amounts due under this Note in accordance with Section 6 of this Note.

(e)  "**Collateral Shares**" means one hundred ninety-five thousand (195,000) shares of Common Stock owned by the Borrower, which shares ertificates are currently included within those represented by Certificate No. CS-01 and will be represented by a separate certificate immediately following the Effective Date.

(f)  "**Effective Date**" means the date of this Note.

(g)  "**Equity Incentive Plan**" means the Miyoko's, PBC 2019 Incentive Stock Plan, as amended.

(h)  "**Event of Default**" has the meaning assigned to it in Section 5.

(i)  "**Note**" means this Full Recourse Promissory Note.

(j)  "**Person**" means a natural person, a corporation, a partnership, an association, limited liability company, a trust, any unincorporated organization, or any other type of entity.

(k)  "**Pledged Collateral**" has the meaning assigned to it in the Security Agreement.

(l)  "**SEC**" means the United States Securities and Exchange Commission.

(m)  "**Security Agreement**" has the meaning assigned to it in Section 4.

(n)  "**Termination of Employment**" means the voluntary or involuntary termination of Borrower's employment relationship with Company for any reason or no reason, with or without cause.

2.  <u>Interest and Payments</u>.

(a)  Interest on the unpaid Principal balance under this Note will accrue at forty-one hundredths of one percent (0.41%) per annum, compounding semi-annually, or if higher, the Applicable Federal Rate in effect on the Effective Date, compounded semi-annually, commencing on the Effective Date.

(b)  Payment of the Principal balance and accrued but unpaid interest will be due and payable on the Due Date.

2

DocuSign Envelope ID: A5C4EFBC-12A5-445C-ABB2-6AB8DAC690CBC

(c)    All payments (including prepayments) will be applied first against accrued but unpaid interest, and secondly against the Principal balance.

3.    <u>Prepayment</u>.

(a)    Borrower may prepay all or any portion of this Note without penalty or premium prior to the date when payments are due.

(b)    Unless otherwise provided in a written consent of Company providing for an Approved Sale, Borrower shall prepay this Note with the net proceeds of any Approved Sale.

4.    <u>Security</u>.

This Note is secured by a pledge of the Pledged Collateral under the terms of a Security Agreement, substantially in the form attached hereto as <u>Exhibit A</u> (as amended, supplemented or modified from time to time, the "**Security Agreement**") and dated as of even date herewith, and is subject to all of the provisions thereof.

5.    <u>Events of Default</u>.

The following constitute events of default under this Note (each, an "**Event of Default**"):

(a)    Borrower shall fail to pay when due any payment on the due date hereunder;

(b)    Borrower fails to perform or observe any of the covenants or obligations of Borrower set forth in this Note or contained in the Security Agreement;

(c)    Borrower shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of all or a substantial part of its property, (ii) be unable, or admit in writing Borrower's inability, to pay Borrower's debts generally as they mature, (iii) make a general assignment for the benefit of creditors, (iv) become insolvent (as such term may be defined or interpreted under any applicable statute), (v) commence a voluntary proceeding for bankruptcy or insolvency, or (vi) take any action for the purpose of effecting any of the foregoing;

(d)    Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower or of all or a substantial part of the property of Borrower, or an involuntary case under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and: (i) the court enters an order for relief; (ii) such proceeding shall not be dismissed or discharged within sixty (60) days of commencement; or (iii) Borrower shall consent thereto; or

3

DocuSign Envelope ID: A5C4EFBC-12A5-445C-ABB2-6AB8DAC890CBC

(e)     Any material impairment in the perfection or priority of the Company's security interest in the Pledged Collateral that did not occur due to any action or inaction by Company.

6.     <u>Rights of Company upon an Event of Default</u>. Upon the occurrence or existence of any Event of Default (other than an Event of Default, referred to in Sections 5(c) or 5(d)) and at any time thereafter during the continuance of such Event of Default, Company may by written notice to Borrower, declare all outstanding obligations hereunder, including all outstanding principal and accrued and unpaid interest, payable by Borrower hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein to the contrary notwithstanding.  Upon the occurrence or existence of any Event of Default described in Sections 5(c) and 5(d), immediately and without notice, all outstanding obligations hereunder, including all outstanding Principal and accrued and unpaid interest, payable by Borrower shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein to the contrary notwithstanding.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Company may exercise any other right power or remedy under the Security Agreement or as otherwise permitted to it by law, either by suit in equity or by action at law, or both.  Upon an Event of Default, Company will also be entitled to recover from Borrower all costs of effecting collection of the amounts due, including reasonable attorneys' fees.  Unpaid principal and interest and other amount due under this Note subject to collection will bear interest at the maximum rate allowed under law.

7.     <u>No Waiver by Company</u>.  No delay, omission or waiver on the part of Company in exercising any right under this Note will operate as a waiver of such right or any other  right of such Company, nor will any delay, omission, or waiver on any one occasion be deemed a bar  to or waiver of the same or any other right on any future occasion.  The rights and remedies of Company are cumulative and not exclusive of any rights or remedies it would otherwise have.

8.     <u>Agreements, Waivers and Acknowledgments of Borrower</u>.

(a)     Except in connection with an Approved Sale, Borrower agrees that Borrower will not sell or otherwise transfer, or permit to be sold or transferred, any of the Collateral Shares or other Pledged Collateral, whether voluntarily or involuntarily, by act of law or otherwise.

(b)     Borrower agrees that, upon the written request of Company, Borrower will deliver to Company a written confirmation that no such sale or transfer has occurred.

(c)     Borrower waives presentment, demand, notice of dishonor, protest, notice of protest and all other demands, protests and notices in connection with

4

the execution, delivery, performance, collection and enforcement of this Note.

(d)     Borrower agrees that the Company has made no representation or warranty to Borrower concerning the tax consequences of the loan to Borrower and Borrower shall be solely responsible for ascertaining and bearing such tax consequences.

9.     <u>Full Recourse</u>.

The holder of this Note will have full recourse against the Borrower, and Borrower will be personally liable for the full amount of the unpaid Principal and accrued interest thereon.  The Company will not be required to proceed against the Pledged Collateral securing the Note pursuant to the Security Agreement in the event of the occurrence of an Event of Default.

10.     <u>Not an Employment Agreement</u>

Borrower understands and acknowledges that this Note does not constitute an employment agreement or a promise by Company to continue Borrower's employment for any specific period or not to terminate that employment other than for cause.

11.     <u>Usury</u>.

In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

12.     <u>Governing Law</u>.

This Note will be governed by and construed in accordance with the internal laws of the State of California (without reference to its conflicts of law provisions).

13.     <u>Waivers</u>.

No waiver or forbearance purportedly granted by the Company of any of its rights under this Note will be valid unless that waiver or forbearance is set forth in a writing signed by the Company.  No waiver or forbearance of the exercise of any right the Company grants in any specific instance will be deemed to be a waiver or forbearance of the same or any other right in any other instance.

*[Signature Page to Follow]*

2.10.1.3.3.1.1 Full Recourse Note (Final).docx.pdf - Page 6

IN WITNESS WHEREOF, the Borrower has executed this Note as of the day and year first above written

**BORROWER:**

Miyoko Schinner

Miyoko Schinner


**ACCEPTED AND ACKNOWLEDGED:**

**MIYOKO'S, PBC**

Louis Kanganis

Louis Kanganis, President

*Signature Page to Full Recourse Promissory Note*

# EXHIBIT A

## SECURITY AGREEMENT

This Security Agreement is executed as of September 25, 2020, by Miyoko Schinner ("**Borrower**") and Miyoko's, PBC, a Delaware corporation ("**Company**").

## RECITALS

A.    Borrower has executed a Full Recourse Promissory Note, dated of even date with this Agreement, with a principal amount of one hundred twelve thousand five hundred dollars ($112,500) in favor of Company (the "**Note**").

B.    In order to induce Company to extend the credit evidenced by the Note, Borrower has agreed to enter into this Security Agreement and to pledge and grant to Company the security interest in the Pledged Collateral described below.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower hereby agrees with Company as follows:

1.    Definitions and Interpretation.  Unless otherwise defined herein, all other capitalized terms used herein and defined in the Note shall have the respective meanings given to those terms in the Note and all terms defined in the UCC shall have the respective meanings given to those terms in the UCC.  For purposes hereof, "**UCC**" means the Uniform Commercial Code as in effect from to time in the State of California; provided, however, that if by reason of mandatory provisions of law, any or all of the perfection or priority of Company's security interest in any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

2.    Collateral.  To secure the Obligations as defined in Section 3 hereof, Borrower hereby pledges to, and grants to Company a security interest in, all of Borrower's right, title and interest in, whether now existing or hereafter arising, the following property (the "**Pledged Collateral**"):

(a)    The securities of Company listed on Schedule A (the "**Pledged Securities**");

(b)    All dividends (including cash dividends), other distributions (including redemption proceeds), or other property, securities, instruments or general intangibles received in respect of or in exchange for the Pledged Securities, whether by way of dividends, stock dividends, recapitalizations, mergers, consolidations, split-ups, divisions, combinations or exchanges of shares or otherwise; and

DocuSign Envelope ID: A5C4EEBC-12A5-445C-ABB2-6AB8DAC890CBC

(c)      All proceeds of the foregoing.

3.      <u>Security for Obligations</u>.  The obligations secured by this Security Agreement (the "**Obligations**") shall mean the principal sum of the Note secured hereby, together with interest thereon, and all other obligations of Borrower or Company under the Note or this Security Agreement.

4.      <u>Delivery of Pledged Collateral; Financing Statements</u>.  All certificates or instruments representing or evidencing the Pledged Collateral shall be promptly (within five days of the date hereof or, if acquired after the date hereof, within five days of the date of acquisition) delivered to Company, accompanied by a stock power in form and substance satisfactory to Company.  Company is authorized to file a UCC-1 financing statement and any necessary amendments covering the Pledged Collateral.  If any of the Pledged Collateral consists of cash, the Company shall retain cash payment and deposit the same in an account controlled by the Company.

5.      <u>Release of Pledged Collateral</u>.

(a)      <u>Payment of Note</u>.  At such time as Borrower pays all amounts owing under the Note in full, the Company will promptly thereafter: (i) will deliver to the transfer agent for the Company signed instructions to release the security interest in the Pledged Collateral; (ii) tender the stock power described in Section 4 back to the Borrower; (iii) deliver to the Borrower any portion of the Pledged Collateral consisting of cash; and (iv) file a UCC-3 termination statement necessary to effect the termination of the Company's security interest in the Pledged Collateral.

(b)      <u>Payment on Approved Sale</u>.  With respect to any Pledged Collateral to be sold or transferred in an Approved Sale (the "**Approved Sale Collateral**"), the security interest in such Approved Sale Collateral shall be released to the extent and upon the terms specified in the Company's consent to such Approved Sale.  Upon such termination and request from Borrower, Company will file any UCC amendments or termination statements necessary to effect such termination and Company will execute and deliver to Borrower any additional documents or instruments as Borrower shall reasonably request to evidence such termination and deliver to the Borrower any stock certificates held by the Company pursuant to Section 4.

6.      <u>Representations and Warranties</u>.  Borrower hereby represents and warrants as follows:

(a)      <u>Ownership of Pledged Securities, Etc</u>.  The Pledged Collateral is owned by Borrower free and clear of any and all liens, pledges, encumbrances (other than encumbrances arising in connection with any agreement that the Company is party to) or charges, and Borrower has not optioned or otherwise agreed to sell, hypothecate, pledge, or otherwise encumber or dispose of the Pledged Collateral.

(b)      <u>Security Interest</u>.  The pledge of the Pledged Collateral creates a valid security interest in the Pledged Collateral, which security interest is (or will be upon the filing of the UCC-1 financing statement and/or the delivery of the Pledged Collateral

referenced in Section 4 above) a perfected and first priority security interest, securing the payment of the Obligations and the obligations hereunder.

(c)   <u>Restatement of Representations and Warranties</u>.  On and as of each date the Pledged Securities becomes Pledged Collateral or any other property becomes Pledged Collateral, the foregoing representations and warranties shall be deemed restated with respect to all such Pledged Collateral.

7.   <u>Securities Restrictions</u>.  Borrower shall not sell, pledge (except to Company), or otherwise transfer (including transfer by gift, operation of law, or upon Borrower's death or disability), any Pledged Securities that remain Pledged Collateral or other securities or property that is Pledged Collateral without the written consent of Company.  From time to time after the date hereof, Borrower shall promptly execute, acknowledge, and deliver any other assurances or documents or instruments reasonably requested by Company and/or reasonably necessary for Company to enforce the foregoing obligations or to obtain the benefits of the foregoing.  Notwithstanding the foregoing, Borrower shall be allowed to sell or transfer Pledged Securities with the  prior written consent of Company, which consent may be conditioned upon such terms and conditions specified by Company (such transaction, an "**Approved Sale**").

8.   <u>Further Assurances</u>.  Borrower agrees that at any time and from time to time, at Borrower's expense, Borrower will promptly execute and deliver all further instruments and documents, including without limitation all additional Pledged Securities, and take all further action, that may be necessary or desirable, or that Company may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Company to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.

9.   <u>Voting Rights; Dividends; Etc.</u>

(a)   <u>Rights Prior to an Event of Default</u>.  So long as no Event of Default shall have occurred and be continuing:

(i)   Borrower shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of this Security Agreement.

(ii)   Borrower shall be entitled to receive and retain free and clear of the security interest of Company hereunder any and all dividends and interest paid in respect of the Pledged Collateral, provided, however, that any and all (A) dividends and interest paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for any Pledged Collateral, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and (C) cash paid, payable or otherwise distributed in respect of principal of, or in

3

redemption of, or in exchange for, any Pledged Collateral, shall be, and shall be forthwith delivered to Company to hold as, Pledged Collateral and shall, if received by Borrower, be received in trust for the benefit of Company, be segregated from the other property or funds of Borrower and be forthwith delivered to Company as Pledged Collateral in the same form as so received (with any necessary endorsement) to be held as part of the Pledged Collateral.

(b)    <u>Rights Following an Event of Default</u>.  Upon the occurrence and during the continuance of an Event of Default:

(i)    All rights of Borrower to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 9(a)(i) and to receive the dividends and interest payments which it would otherwise be authorized to receive and retain pursuant to Section 9(a)(ii) shall cease and all such rights shall thereupon become vested in Company, which shall thereupon have the sole right, but not the obligation, to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends and interest payments; and

(ii)    All dividends and interest payments which are received by Borrower contrary to the provisions of subparagraph (i) of this Section 9(b) shall be received in trust for the benefit of Company, shall be segregated from other funds of Borrower and shall be forthwith delivered to Company as Pledged Collateral in the same form as so received (with any necessary endorsement).

10.    <u>Events of Default; Remedies</u>.

(a)    <u>Event of Default</u>.  An Event of Default shall be deemed to have occurred under this Security Agreement upon the occurrence and during the continuance of an Event of Default under the Note.

(b)    <u>Rights Under the UCC</u>.  In addition to all other rights granted hereby, or under the Note, and otherwise by law, Company shall have with respect to the Pledged Collateral the rights and obligations of a secured party under the UCC.

(c)    <u>Sale of Pledged Collateral</u>.  Borrower acknowledges and recognizes that Company may be unable to effect a public sale of all or a part of the Pledged Collateral and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire the Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Borrower acknowledges that any such private sales may be at prices and on terms less favorable to Company than those of public sales (and may be at prices below the most recent fair market value for common stock determined by Company's Board of Directors), and agrees that so long as such sales are made in good faith such private sales shall be deemed to have been made in a commercially reasonable manner and

that Company has no obligation to delay sale of any Pledged Collateral to permit the issuer thereof to register it for public sale under the Securities Act of 1933, as amended or under any state securities law.

(d)     <u>Compliance with Laws</u>.  Upon the occurrence and during the continuance of an Event of Default, and at Company's request, Borrower further agrees to use Borrower's best efforts to cooperate with Company in taking whatever additional action may be required to effect such public or private sale of the Pledged Collateral in compliance with applicable laws.

(e)     <u>Notice, Etc.</u> In any case where notice of sale is required, ten (10) days' notice shall be deemed reasonable notice.  Company may have resort to the Pledged Collateral or any portion thereof with no requirement on the part of Company to proceed first against any other Person or property.

(f)     <u>Records and Information</u>.  Upon the occurrence and during the continuance of an Event of Default, at the request of Company, Borrower shall assemble and make available to Company all records relating to the Pledged Collateral at any place or places specified by Company, together with such other information as Company shall request concerning Borrower's ownership of the Pledged Collateral and relationship to Company.

11.     <u>Secured Party Appointed Attorney-in-Fact</u>.  Borrower hereby appoints Company as Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in Company's discretion and to the full extent permitted by law to take any action and to execute any instrument which Company may deem reasonably necessary or advisable to accomplish the purposes of this Security Agreement in accordance with the terms and provisions hereof, including without limitation, to receive, endorse and collect all instruments made payable to Borrower representing any dividend, interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.  Borrower hereby ratifies all reasonable actions that said attorney shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.  The powers conferred on Company hereunder are solely to protect its interests in the Pledged Collateral and shall not impose any duty upon Company to exercise any such powers. Company shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and in no event shall Company or any of its officers, directors, employees or agents be responsible to Borrower for any act or failure to act, except for gross negligence or willful misconduct.

12.     <u>Miscellaneous</u>

(a)     <u>Notices</u>.  Except as otherwise provided herein, all notices, requests, demands, consents, instructions or other communications to or upon Company or Borrower under this Agreement or the Note shall be in writing and mailed, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service to each

DocuSign Envelope ID: A5C4EFEC-12A5-445C-ABB2-6AB8DAC690CBC

party at the address or email address last given to the other party.  All such notices and communications shall be effective (a) when sent by an overnight service of recognized standing, on the business day following the deposit with such service; (b) when mailed by registered or certified mail, first class postage prepaid and addressed as aforesaid through the United States Postal Service, upon receipt; (c) when delivered by hand, upon delivery; and (d) when transmitted by electronic mail, upon confirmation of receipt or upon proof of delivery obtained by the sender.

(b)      <u>Nonwaiver</u>.  No failure or delay on Company's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

(c)      <u>Amendments and Waivers</u>.  This Security Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Borrower and Company.  Each waiver or consent under any provision hereof shall be effective only in the specific instances for the purpose for which given.

(d)      <u>Assignments</u>.  This Security Agreement shall be binding upon and inure to the benefit of Company and Borrower and their respective successors and assigns; <u>provided</u>, <u>however</u>, that Borrower may not assign its rights and duties hereunder without the prior written consent of Company and any assignment without such consent shall be null and void.

(e)      <u>Cumulative Rights, etc</u>.  The rights, powers and remedies of Company under this Security Agreement shall be in addition to all rights, powers and remedies given to Company by virtue of any applicable law, rule or regulation of any governmental authority, the Note or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Company's rights hereunder. Borrower waives any right to require Company to proceed against any Person or to exhaust any collateral or to pursue any remedy in Company's power.

(f)      <u>Payments Free of Taxes, Etc.</u> All payments made by Borrower under this Security Agreement shall be made by Borrower free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings.  In addition, Borrower shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Security Agreement.  Upon request by Company, Borrower shall furnish evidence satisfactory to Company that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

6

(g)    <u>Partial Invalidity</u>.  If any time any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(h)    <u>Expenses</u>.  Each of Borrower and Company shall bear its own costs in connection with the preparation, execution and delivery of, and the exercise of its duties under, this Security Agreement and the Note.  Borrower shall pay on demand all reasonable fees and expenses, including reasonable attorneys' fees and expenses, incurred by Company with respect to any amendments or waivers hereof requested by Borrower or in the enforcement or attempted enforcement of any of the Obligations or in preserving any of Company's rights and remedies (including, without limitation, all such fees and expenses incurred in connection with any "workout" or restructuring affecting this Agreement, the Note or the Obligations or any bankruptcy or similar proceeding involving Borrower or any of its Subsidiaries).

(i)    <u>Termination of Security Interest</u>.  Upon the payment in full of all of the Obligations, the security interest granted herein shall terminate and all rights to the Pledged Collateral shall revert to Borrower.  Upon such termination and request from Borrower, if any UCC termination statement has been filed, then Company will file any UCC termination statements necessary to effect such termination and Company will execute and deliver to Borrower any additional documents or instruments as Borrower shall reasonably request to evidence such termination.

(j)    <u>Governing Law</u>.  This Security Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to conflicts of law rules.

(k)    <u>Headings; Counterparts</u>.  The heading references herein are for convenience purposes only and shall not be deemed to limit or affect any of the provisions hereof.  This Security Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*(Signature page follows.)*

DocuSign Envelope ID: A5C4EEBC-12A5-445C-ADB2-6AB8DAC80CBC

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement as of the day and year first above written.

BORROWER:

                                         _____

                                         Miyoko Schinner

           Address:    2600 Nicasio Valley Road
                                         Nicasio, CA  94946
                                         e-mail: _____

COMPANY:

                                         MIYOKO'S, PBC

                                         A Delaware corporation

                                         _____

                                         Louis Kanganis, President

           Address      2086 Marina Avenue
                                         Petaluma, CA  94954
                                         Attention:  President
                                         e-mail: lkanganis@miyokos.com

**SCHEDULE A TO SECURITY AGREEMENT**

**PLEDGED SECURITIES**

| Certificate No. | Certificate Date | Shares | Type of Security |
|---|---|---|---|
|  |  | 195,000 | Common Stock |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |