Lisa Bloom (SBN 158458)
Alan Goldstein (SBN 296430)
The Bloom Firm
26565 Agoura Road Suite 200
Calabasas, CA 91302
Telephone: (818) 914-7319
Facsimile: (866) 884-8079
Avi@TheBloomFirm.com
Attorneys for Defendant and Counterclaimant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIYOKO'S, PBC, a Delaware Corporation,<br><br>　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>MIYOKO SCHINNER, an individual,<br><br>　　　　　　　　　　Defendant.<br><hr>MIYOKO SCHINNER, an individual,<br><br>　　　　　　　　　　Counterclaimant,<br><br>　v.<br><br>MIYOKO'S, PBC, a Delaware Corporation; and DOES 1-10.<br><br>　　　　　　　　　　Counterdefendants. | Case No. 4:23-cv-00711-DMR<br><br>Assigned to the Hon. Donna M. Ryu<br><br>**DEFENDANT AND COUNTERCLAIMANT MIYOKO SCHINNER'S COUNTERCLAIMS**<br><br>1. GENDER DISCRIMINATION (Cal. Gov. Code § 12940(a))<br>2. FAILURE TO PREVENT DISCRIMINATION (Cal. Gov. Code § 12940(k))<br>3. RETALIATION (Cal. Gov. Code § 12940(h))<br>4. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY<br>5. VIOLATION OF RIGHT OF PUBLICITY (Cal. Civ. Code §3344)<br>6. MISAPPROPRIATION OF NAME AND LIKENESS<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1. Defendant and Counterclaimant Miyoko Schinner ("Miyoko") is a groundbreaking, beloved creator of popular plant-based cheeses and butter, motivated by her passion to save animals and the planet. In 2014, she founded Miyoko's Kitchen (now Miyoko's Creamery), a revolutionary, multi-million dollar plant-based food corporation. Due to her hard work and under Miyoko's leadership, the company – Plaintiff and Counterdefendant Miyoko's, PBC ("MP") – grew exponentially and exceeded all expectations year after year. Miyoko won several awards and, in 2021, was named in Forbes Magazines's 50 over 50. To this day, MP acknowledges that Miyoko's "passion for her craft and mission is unrivaled."[1]

2. In 2021, MP hired René Weber, an executive who singled out and openly denigrated women, especially Miyoko, making it impossible for her to continue to effectively do her job. On behalf of herself and other women at MP, Miyoko complained to HR. MP swiftly retaliated against Miyoko by demoting her and then terminating her.

3. To this day, MP continues to prominently display Miyoko's name and likeness on its website, despite its knowledge that it had no right to do so. MP has flatly ignored her cease and desist letters demanding the removal of her likeness from its websites.

  

---

[1] Miyokos.com/pages/story

4. Miyoko brings her Counterclaims against MP for unlawful employment practices, including gender discrimination and retaliation, and for its unlawful use of her likeness on its website without her consent. MP must now be held accountable for the harm it caused her and continues to cause her.

## PARTIES

5. Defendant and Counterclaimant MIYOKO SCHINNER is an individual who resides in Nicasio, California.

6. Plaintiff and Counterdefendant MIYOKO'S, PBC is a Delaware public benefit corporation having its principal place of business in Petaluma, California.

7. The true names and capacities, whether individual, public entity, corporate, associate or otherwise, of Counterdefendants DOES 1 through 10 ("DOES 1-10"), inclusive, are unknown to Miyoko at this time, who therefore sues DOES 1-10 by such fictitious names. When the true names and capacities of DOES 1-10 are ascertained, Miyoko will seek leave of this Court to amend the Counterclaims to allege their true names and capacities. Miyoko is informed and believes, and thereon alleges, that each counterdefendant designated herein as a Doe is responsible in some manner for each other counterdefendant's acts and omissions and for the resulting injuries and damages to Miyoko, as herein alleged.

## FACTUAL ALLEGATIONS

8. Over the past four decades, Miyoko has written vegan cookbooks, taught cooking classes, opened and sold a vegan restaurant (called Now & Zen) and launched a vegan natural foods company and vegan brands, including a competitor to Tofurky. In 2012, she published *Artisan Vegan Cheese*, the seminal cookbook that put vegan cheesemaking on the map.

9. In September 2014, Miyoko's Kitchen, the vegan creamery company she founded, went live online. Three days later, it had more than 500 unique orders, averaging $100 each. Miyoko, who had earlier envisioned opening a little cheese

shop, began selling to distributors. The rest of the story is playing out today at 30,000 retailers, including Whole Foods and Target, both nationwide and internationally. MP now has a current valuation of $260 million.

10. In January of 2021, MP hired Rene Weber to be VP of Operations. Mr. Weber immediately began a campaign of mistreating women who worked at MP, including Miyoko, by excluding them from meetings, denying them information they needed, berating them publicly and privately, and otherwise making it difficult to impossible to do their jobs. Mr. Weber openly denigrated women, their expertise, and their contributions at MP, calling some "stupid" and "terrible." He did not use these condescending terms with men. On several occasions, he mansplained to Miyoko that she did not understand her own products or MP, the company she founded. In a markedly gendered tone, he described her ideas and ambition as unrealistic, driven by emotion and whim.

11. Miyoko, then CEO of MP, often complained to James Joaquin (Co-Founder & Managing Director of Obvious Ventures, an investor of MP) and John Kenney (Co-Founder at Cult Capital, an investor of MP) about Mr. Weber's condescending behavior to her which she believed was due to her gender.

12. In December 2021, John Zabrodsky, an operations consultant hired by MP at the behest of PowerPlant Partners (MP's lead investor), presented a report on MP operations in a meeting wherein he addressed Miyoko in a very condescending manner. He would not have addressed her in this manner had Miyoko not been a woman. Miyoko complained about Mr. Zabrodsky's gendered behavior to an executive at PowerPlant Partners.

13. In early 2022, after Miyoko made multiple complaints about Mr. Weber's mistreatment of women, MP directed her to promote Mr. Weber to the position of Chief Operating Officer due to its concerns that he was a "flight risk." Mr. Kenney acknowledged Miyoko's prior complaints of Mr. Weber's mistreatment of women at MP, but he told her that we "could not afford to lose"

Mr. Weber and that MP needed to promote Mr. Weber. Another executive noted to Miyoko that Mr. Weber was "our key to get to $200 million" in sales.

14. In January of 2022, at a Board meeting, Miyoko reported Mr. Zabrodsky's gendered behavior to Daniel Gluck (Managing Partner of PowerPlant Partners), Mr. Kenney, Mr. Joaquin and Mr. Weber. Mr. Gluck quickly rebuffed her by saying, "I don't know about any misogyny, but we need to discuss [Mr. Zabrodsky's operations] report. What else does it say?"

15. In February 2022, Miyoko complained to Lisa Feria (an MP Board member and Managing Partner & CEO at Stray Dog Capital, an investor of MP) about gendered treatment against her by members of the Board. Miyoko perceived much of this gendered treatment when it doubted her capabilities as CEO and sought to hire a President to seize much of her responsibilities. Ms. Feria confided in Miyoko about feeling ineffective and ignored by the male Board members in meetings.

16. In late May of 2022, Miyoko complained to MP's then Director of HR about gendered treatment from Jorge Couce, a Senior Director at MP. Upon information and belief, HR never investigated Miyoko's gender discrimination complaint.

17. On June 9, 2022, MP's Board removed Miyoko from MP's CEO role. Miyoko remained as MP's Board Chair and as a MP employee. Jon Blair, MP's Chief Financial Officer, stepped into the role of interim President to guide the transition and run day-to-day operations.

18. On June 14, 2022, Miyoko emailed Mr. Blair to complain about Mr. Weber. She stated in the email:

> We lost two female employees due to [Mr. Weber's] mistreatment of them – I found an email from Louis [Kanganis] about one of them, actually. He was going to fire another female in his department earlier this year, someone who has been here for years and while not stellar, has been a good member of the team and is willing to do anything despite her

age and family issues. I was able to put a stop to that. He has a dismissive way with female employees that is not good.

19. On July 9, 2022, Miyoko confirmed her prior oral complaints of gender discrimination in an email to Ms. Feria, presenting a "timeline of misses, issues, and other problems in [her] assessment of [Mr. Weber]." She wrote, in part:

> At least 8 women have complained about [Mr. Weber's] rudeness, arrogance, and dismissive attitude. It is well known that his demeanor toward them contributed to the parting of at least two [names omitted]. Others were too afraid to complain about him because he wields so much power. Tight with the HR Director, making it difficult for low-level employees to do anything. On a number of occasions, employees have come to me with problems or complaints that had fallen on deaf ears with HR or Ops. When I reported the complaints, and HR would do an "investigation," and the fault invariably fell with those complaining, while those complained about were found innocent. He has openly criticized a number of female employees to me, calling them "not good," "stupid," "terrible," etc. One employee apparently reported leaving because of "integrity issues" with René and Jorge. Prior to my "reassignment," I reported to René that it had come to my attention that 4 women recently had felt dismissed or disrespected by Jorge. He seemed surprised and told me to file a complaint with HR, which I did. There was time to get back to me on this before my vacation, and assuming that Lenora had not been informed I had been fired, but she nor René never did.

20. Just a few days later, on July 28, 2022 MP terminated Miyoko's employment entirely. MP set August 12, 2022 as the effective termination date.

21. MP's termination of Miyoko's employment was an act of retaliation for her complaints of discrimination against Mr. Weber and Mr. Zabrodsky. Indeed, Mr. Joaquin earlier characterized Miyoko's attempts to hold Mr. Weber accountable for his misconduct as "irrational." It bothered MP executives that Miyoko stood up for her rights and the rights of other women in the company, demanding respectful treatment and refusing to conform to the stereotype of a docile, complacent, obedient Asian-American woman. Miyoko was not acceptable

to them as a person with decision-making power and authority in the company. It was only the image of her celebrity status and prominence in the vegan and food worlds which MP continues to use in branding and marketing that MP desired to retain.

22. After Miyoko's termination, Mr. Blair advised her that she could keep the keys to MP's premises and that she could keep her two company laptops.

23. MP never obtained the right to use Miyoko's name, image and likeness after her termination. Yet MP used Miyoko's name, image and likeness on its website and on a food truck that was about to commence a multi-week tour from California to Austin. In August 18, 2022, Miyoko, through her legal counsel, demanded that MP cease and desist its use and exploitation of her publicity rights. After receiving no response, Miyoko, through her legal counsel, again demanded that MP cease and desist its use and exploitation of her publicity rights. To this day, MP has willfully refused to comply – Miyoko's name, image and likeness remains on its website and the food truck completed the multi-week tour from California to Austin.



24. MP has excluded Miyoko from Board meetings and from her rights as a director to "inspect and copy all books, records and documents of every kind" as provided by California Corporations Code section 8334.

### Exhaustion of Administrative Remedies

25. On February 17, 2023, Miyoko submitted her claims to the California Civil Rights Department.

26. On that same day, Miyoko requested and obtained an immediate Right-to-Sue letter from the California Civil Rights Department.

### FIRST CAUSE OF ACTION
### GENDER DISCRIMINATION (Cal. Gov. Code § 12940(a))

27. Counterclaimant restates and incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

28. MP, who employs more than five employees, is an "employer" under the Fair Employment & Housing Act ("FEHA"). Miyoko, a female employee, was a member of a protected class within the meaning of the FEHA and is entitled to its guarantees of full and equal access to employment. See Cal. Gov't Code § 12926.1.

29. The FEHA provides that the opportunity to seek, obtain, and hold employment without discrimination because of, inter alia, sex or gender is a civil right. See Cal. Gov't Code §§ 12921(a).

30. The purpose of the FEHA is to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on the account of, *inter alia*, a person's sex or gender. The FEHA recognizes that the practice of denying employment opportunities and discriminating in terms of employment substantially and adversely affects the interest of employees, employers, and the public in general. See Cal. Gov't Code § 12920.

31. The FEHA makes it an unlawful employment practice for an employer to discriminate against an employee "in terms, conditions, or privileges of employment" on the basis of the employee's sex or gender. Cal. Gov't Code § 12940(a). At all times herein mentioned, the FEHA was in full force and effect and was binding on MP.

32. As alleged herein, Miyoko's gender was a motivating factor in MP male executives' condescending treatment of her and in MP's decision to demote and then terminate her employment, and/or to take other adverse job actions against her. Miyoko's male colleagues were treated more respectfully and more favorably than her. Thus, MP discriminated against Miyoko, in whole or in part, on the basis of Miyoko's gender in violation of California Government Code section 12940(a).

33. As a proximate result of MP's willful, knowing, and intentional discrimination against Miyoko, Miyoko has sustained and continues to sustain substantial losses of earnings and other employment benefits, and has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

34. Miyoko has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code section 12965(b), Miyoko is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

35. MP committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Miyoko, from an improper and evil motive amounting to malice, and in conscious disregard of Miyoko's rights. Miyoko is thus entitled to punitive damages from MP in an amount according to proof.

///
///
///

## SECOND CAUSE OF ACTION
## FAILURE TO PREVENT DISCRIMINATION (Cal. Gov. Code § 12940(k))

36. Counterclaimant restates and incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

37. California law requires employers to "take all reasonable steps necessary to prevent" and correct wrongful behavior, including but not limited to, discriminatory and harassing behavior in the workplace. See Cal. Gov't Code §12940(k). Pursuant to this statute, MP was required to take all reasonable steps to prevent discrimination and retaliation based on Miyoko's sex, gender, and/or disability.

38. During the course of Miyoko's employment, MP failed to prevent Mr. Weber, Mr. Zabrodsky and others from engaging in intentional actions that resulted in Miyoko being treated less favorably, and subjected to harassment and a hostile work environment, because of Miyoko's protected status (i.e., gender). Although MP was aware of a number of actions and comments to and about Miyoko that constituted discrimination and retaliation, MP did not take immediate or corrective action to prevent further harassment, discrimination, and/or retaliation against Miyoko.

39. As alleged herein and above, MP violated California law by failing to take all reasonable steps necessary to prevent the harassment, discrimination, and retaliation from occurring. See Cal. Gov't. Code § 12940(k).

40. As a proximate result of MP's willful, knowing, and intentional failure to prevent, investigate or remedy harassment, discrimination, and retaliation against Miyoko, Miyoko has sustained and continues to sustain substantial losses of earnings and other employment benefits.

41. As a proximate result of MP's willful, knowing, and intentional failure to prevent, investigate, or remedy discrimination, harassment, or retaliation against Miyoko, Miyoko has suffered and continues to suffer humiliation, emotional

distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

42. Miyoko has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code section 12965(b), Miyoko is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

43. MP committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Miyoko, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Miyoko. Miyoko is thus entitled to punitive damages from MP in an amount according to proof

## THIRD CAUSE OF ACTION
### RETALIATION (Cal. Gov. Code § 12940(h))

44. Counterclaimant restates and incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

45. FEHA requires MP to refrain from retaliating against any employee for opposing practices forbidden by the FEHA or who asserts rights under FEHA, including complaining of discrimination on the basis of gender, among other things.

46. MP, through its agents and supervisors, took discriminatory and retaliatory action against Miyoko.

47. As alleged herein and above, during Miyoko's employment with MP, MP intentionally engaged in discrimination, about which Miyoko complained to MP.

48. MP terminated Miyoko's employment in retaliation for her engaging in protected activity, including her discrimination complaints described above.

49. As a proximate result of MP's willful, knowing, and intentional retaliation against Miyoko, Miyoko has sustained and continues to sustain substantial losses of earnings and other employment benefits.

THE BLOOM FIRM

50. As a proximate result of MP's willful, knowing, and intentional retaliation against Miyoko, Miyoko has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

51. Miyoko has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code section 12965(b), Miyoko is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

52. MP committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Miyoko, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Miyoko. Miyoko is thus entitled to punitive damages from MP in an amount according to proof.

## FOURTH CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

53. Counterclaimant restates and incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

54. Miyoko was employed by MP as its CEO.

55. As alleged herein and above, during Miyoko's employment with MP, MP intentionally engaged in discrimination, about which Miyoko complained to MP.

56. MP discharged Miyoko.

57. California public policy and FEHA prohibit employers from terminating an employee because the employee opposed practices forbidden by the FEHA.

58. FEHA's policy prohibiting discrimination in employment is sufficiently substantial and fundamental to support a claim for wrongful termination in violation of public policy. (See *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 660.)

59. Miyoko's complaints of gender discrimination were a substantial motivating reason for her discharge.

60. As a result of her discharge, Miyoko was harmed.

61. The discharge was a substantial factor in causing Miyoko's harm.

62. MP committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Miyoko, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Miyoko. Miyoko is thus entitled to punitive damages from MP in an amount according to proof.

## FIFTH CAUSE OF ACTION
## VIOLATION OF RIGHT OF PUBLICITY (Cal. Civ. Code §3344)

63. Counterclaimant restates an incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

64. After her termination, MP knowingly used Miyoko's name on its products for commercial and monetary purposes.  MP also knowingly used Miyoko's name, image, likeness and voice on its website for commercial and monetary purposes.  Likewise, MP knowingly used Miyoko's name, image and likeness on a food truck making a multi-week tour from California to Austin. MP had actual or constructive knowledge that its products, website and truck illegally portrayed Miyoko's image and likeness in violation of her right of publicity under California Civil Code § 3344(a).

65. These uses were directly connected to MP's commercial purposes of collecting users' data, increasing traffic and viewership, increasing revenues and profits, and growing and maintaining their businesses and relevant market shares.

66. Since her termination, Miyoko has never consented to MP's unauthorized and illegal uses of her name, image, voice and likeness .  MP knew or should have known of Miyoko's non-consent because Miyoko herself and/or through her agents has directly and repeatedly informed MP of the same.

67. At all relevant times, MP had actual or constructive knowledge that it was materially contributing to this violation of Miyoko's right of publicity by appearing as if it was authorized to use Miyoko's name, image, voice and likeness, which they were not.

68. At all relevant times, MP used Miyoko's name, image, voice and likeness to generate revenue.

69. MP's wrongful conduct, which is ongoing, is causing, and is a substantial factor in causing, irreparable harm to the commercial value of Miyoko's right of publicity, which she is and has been committed to protecting and developing.

70. MP's violation of Miyoko's right of publicity has been deliberate, willful, and in utter disregard of Miyoko's rights.

71. Miyoko seeks injunctive relief to put an end to this ongoing irreparable harm. She also seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by MP, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## MISAPPROPRIATION OF NAME AND LIKENESS

72. Counterclaimant restates and incorporates by reference, as though fully set forth herein, the allegations contained in each of the paragraphs above.

73. During all times relevant to this Complaint, MP has misappropriated, and continues to misappropriate, Miyoko's name, image, and likeness, in violation of California common law, including on its website and on a food truck.

74. During all times relevant to this Complaint, MP has and still is permitting, encouraging, materially contributing to, and otherwise inducing the illegal use of Miyoko's name, likeness, and other aspects of her identity for MP's own commercial benefit or advantage.

75. Since her termination, Miyoko has never consented to MP's use of her name, likeness, or identity

76. MP's wrongful conduct has been, and continues to be, an actual and proximate cause of Miyoko's injuries, including but not limited to the commercial value of her name, likeness, and identity, which Miyoko is and has been committed to protecting and developing.

77. MP's ongoing wrongful conduct is causing, and is a substantial factor in causing, irreparable harm to the commercial value of Miyoko's name, likeness, and identity.  Miyoko thus seeks injunctive relief to halt this irreparable harm and also seeks all available damages for past harm, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Miyoko prays for judgment and damages against each of the Counterdefendants as follows:

1. General damages in an amount to be determined by proof at trial;

2. Past and future medical and related expenses in an amount to be determined by proof at trial;

3. Future lost earnings in an amount to be determined by proof at trial;

4. Impairment of earning capacity in an amount to be determined by proof at trial;

5. Punitive damages from MP pursuant to applicable law;

6. Reasonable attorney's fees pursuant to applicable law;

7. Prejudgment and post-judgment interest, including but not limited to, California Civil Code section 3288; and

8. Any other and further relief that the Court considers just and proper.

## DEMAND FOR JURY TRIAL

78. Miyoko hereby requests a trial by jury as to all claims and counterclaims seeking monetary damages.

DATED:  March 16, 2023                             The Bloom Firm

                                                                        /s/ *Lisa Bloom*
                                                                        Lisa Bloom

Alan Goldstein
Attorneys for Defendant and Counterclaimant
MIYOKO SCHINNER

# PROOF OF SERVICE
MIYOKO'S, PBC v. MIYOKO SCHINNER
USDC, Northern District of California
Case No.: 4:23-cv-00711-DMR

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 26565 Agoura Road, Suite 200, Calabasas, California 91302.

On March 16, 2023, I served the following document described as:

**DEFENDANT AND COUNTERCLAIMANT MIYOKO SCHINNER'S COUNTERCLAIMS.**

The above-referenced documents were served on the interested parties in this action as follows:

PLEASE SEE ATTACHED SERVICE LIST.

[X]   **BY ELECTRONIC TRANSMISSION VIA CM/ECF:** I caused the document to be electronically delivered to the interested parties at the addresses on the attached Service List via the Court's CM/ECF System.

[ X ]   **BY ELECTRONIC TRANSMISSION:** I caused the said document(s) to be transmitted electronically, per stipulation of counsel and/or state or local rules, to the addressees referenced on the attached Service List at the email addresses shown below their names. My email address is Steve@TheBloomFirm.com

[ X ]   **FEDERAL:** I declare that I am employed in the offices of a member of the bar of this court at whose direction this service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that this declaration was executed on March 16, 2023, at Lancaster, California.

_____
STEVEN K. CONLON

## SERVICE LIST

Micha Danzig, Esq.
      mdanzig@mintz.com
Nicole M. Rivers, Esq.
      nmrivers@mintz.com
Mike C. Flesuras, Esq.
      mcflesuras@mintz.com
MINTZ LEVIN COHN, et al.
3850 Carmel Mountain Road, Suite 300
San Diego, California 92130
[Attorneys for Plaintiff, Miyoko's, PBC, a Delaware Corporation]

PROOF OF SERVICE